IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

AIG AVIATION INSURANCE and
CURTIS AND CURTIS INC.,

       Plaintiffs,

                                      Case No. 09-352 BB/LFG

       v.

AVCO CORPORATION d/b/a LYCOMING ENGINES,
and KELLY AEROSPACE,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on motions for summary judgment filed by Defendants Avco Corporation (d/b/a Lycoming Engines; "Avco") and Kelly Aerospace ("Kelly"). (Docs. 33 and 36, respectively). Defendants' motions are substantively similar. Because of this overlap, and to avoid confusion about which motion the Court is addressing, the motions are addressed as one.

For the reasons set forth below, Defendants' motion is Denied in part and Granted in part.

**<u>Standard of Review</u>**

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). When applying this standard, a court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Serv.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See Trainor v. Apollo Metal Specialties, Inc.,* 318 F.3d 976, 979 (10th Cir. 2002); *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998).  If this burden is met, the nonmovant cannot rest on the pleadings, but must set forth specific facts by reference to affidavits, deposition transcripts, or other exhibits to support the claim.  *See Serna v. Colo. Dep't of Corr.,* 455 F.3d 1146, 1151 (10th Cir. 2006) (citing *Behrens v. Pelletier,* 516 U.S. 299, 309 (1996)).  The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  A mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact.  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999).  Instead, the nonmoving party must present facts such that a reasonable jury could find in its favor.  *Id.*  Evidence relied upon in opposition to summary judgment "may be insufficient to create a triable fact if it is non-specific or otherwise non-responsive, vague, conclusory, or self-serving."  *Piercy v. Maketa,* 480 F.3d 1192, 1197-98 (10th Cir. 2007).  The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004).

**<u>Factual and Procedural Background</u>**

On the evening of April 13, 2006, a small plane flying over southern New Mexico was forced to make an emergency landing after its engine suddenly cut out.[1]  While the pilot escaped

---

[1]  In accordance with Rule 56, the following facts are stated as favorably to the nonmovant as the record permits, omitting extraneous detail.  *See Adler*, 144 F.3d at 670.

injury, the plane itself was severely damaged.  The craft's owner, Curtis and Curtis ("C&C"),

undertook an examination and found that a malfunction of one of the plane's turbochargers was

to blame.  Based on this information, C&C and their insurer, AIG Aviation Insurance, filed suit

against the manufacturers of the turbocharger, Kelly, and the engine, Avco.

      Avco and Kelly are in the aviation business.  Among other things, Avco makes aircraft

engines.  Kelly makes parts for aircraft engines, including the turbocharger at issue here.

      The turbocharger's trip from Kelly to C&C was a long and attenuated one.  After

manufacturing the turbocharger, Kelly sold it to Avco.  Avco installed it on one of their engines

and sold the engine, along with a two-year warranty, to Piper Aircraft Corporation.  Piper

installed the engine into the fuselage of a PA-46 Malibu Mirage and sold the finished plane to

Flightline Group, one of its distributors.  Flightline sold the plane to Screening Services

International, who first operated the plane on September 25, 2000 and, in doing so, started the

clock on Avco's two-year warranty.  In May 2002, Screening Services sold the craft to Epps Air

Service, Inc., a dealer.  A couple of weeks later, Epps sold the plane to another dealer, Signature

Combs Aircraft Sales, Inc.  Signature Combs held onto the craft for eight months and then, on

February 3, 2003, sold it to C&C.

      C&C's acquisition of the plane appears to have been unique for the company.  C&C's

primary business involves the sale of grass seeds and legumes, including native grass seeds for

irrigated pastures, golf courses, and industrial sites.  Since success in the grass-seed and legume

business does not hinge on the ownership of aircraft, C&C's reason for purchasing the plane is

unclear.  *See* AF ¶ 4.  More clear is that C&C had limited commercial ambitions for the craft.

*See* AF ¶¶ 3-8.  In the thirty-eight months between C&C's purchase and the crash, no C&C

employee ever flew the craft for hire or became licensed to fly for commercial purposes. *Id.* No

C&C employee ever became qualified to maintain or work on the plane. *Id.* C&C never rented

or leased out the aircraft for commercial use or used the plane to engage in the business of either

transporting people for profit or training pilots. *Id.*

In the years that C&C owned the plane, Avco made two repairs. In May 2003, Avco

replaced the oil, sump assembly, and a cylinder-and-piston assembly. Less than a year later,

Avco replaced a cylinder-exhaust riser. Avco purports to have made both repairs "pursuant to its

warranty," but its warranty expired by its own terms in September 2002—over four months

before C&C's purchase. None of the parties offer any explanation as to why they believed that

the plane was still covered by warranty.

C&C filed this action in April 2009. C&C's suit asserts 28 U.S.C. § 1332 jurisdiction and

alleges claims of negligence (Counts I and II), strict liability (Count III), and breach of implied

warranties of merchantability and fitness for a particular purpose (Count IV). In response,

Defendants answered and moved for summary judgment.

## Analysis

Defendants' summary judgment motion raises three issues. Namely, whether 1) C&C's

negligence and strict liability claims are barred by New Mexico's economic loss rule, 2) C&C's

implied-warranty claims are time-barred, and 3) the implied warranties on which C&C relies

were expressly disclaimed.   The Court addresses these issues in order.

### *New Mexico's Economic Loss Rule*

First recognized in *Utah International Inc. v. Caterpillar Tractor Co.*, New Mexico's

economic loss rule holds that "in commercial transactions, where there is no great disparity in

bargaining power of the parties, economic losses from injury of a product to itself are not recoverable in tort actions; damages for such economic losses in commercial settings in New Mexico may only be recovered in contract actions." 775 P.2d 741, 744 (N.M. App. 1989)[2]. Narrower than the rule announced in the Supreme Court case from which it was drawn, *compare id. and East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 867 (1986), the New Mexico rule explicitly added the requirement that there be relatively equal bargaining power among the parties. *Utah Int'l,* 775 P.2d at 744; *but see U.S. Aviation Underwriters Inc. v. Pilatus Business Aircraft, Ltd.*, 358 F.Supp.2d 1021, 1027 (D. Colo. 2005) ("Reading closely, it is clear equality of bargaining power and meaningful allocation of risk are touchstones of the [*East River*] Court's analysis."); *see also Clark v. Rowe*, 701 N.E.2d 624, 626 (Mass. 1998) ("When the economic loss rule has been applied, the parties usually were in a position to bargain freely concerning the allocation of risk . . . .")[3]

---

[2] Avco's initial briefing of this issue blatantly omits the dispositive caveat that the economic loss rule is only applicable to transactions where there is no great disparity in bargaining power.  In one instance, Avco's counsel goes so far as to quote *Utah International's* holding—which is contained in a single sentence that begins, "Therefore, we hold . . . ."—but omits the part of the sentence that mentions disparate bargaining power.

[3] "Some courts have applied the economic loss rule specifically to commercial plaintiffs, leaving open the possibility that a noncommercial consumer may be able to recover purely economic losses in tort." Am. Jur. 2d <u>Prod. Liab.</u> § 1917 (citing *Utah Int'l,* 775 P.2d at 741); *see also Trans States Airlines v. Pratt & Whitney Canada, Inc.,* 682 Ne.2d 45, 54 (Ill. 1997) (citing *Utah Int'l* for same proposition); *Tenn. Farmers Mut. Ins. Co. v. Ford Motor Co.*, 2002 WL1332492 at *3 n. 5 (Tenn. App. 2002) (same).  As discussed herein, this Court believes subsequent New Mexico precedent has assumed parity of bargaining power is a prerequisite to invocation of the economic loss rule.  The Court will, however, consider a motion to certify this question to the New Mexico Supreme Court if any party provides meaningful authority to the contrary.

In understanding why New Mexico courts included this additional hurdle, it may be useful to take a step back. The economic loss rule's basic premise is that parties who have both the capacity and inclination to allocate risk and liability through a contract should not, *ex post*, be subjected to the unsteady waters of tort liability when the object sold damages itself. *See Amrep Southwest, Inc. v. Shollenbarger Wood Treating, Inc.*, 893 P.2d 438, 446 (N.M. 1995) ("As a matter of policy, the parties should not be allowed to use tort law to alter or avoid the bargain struck in the contract. The law of contract provides an adequate remedy.")*; Town of Alma v. Azco Const., Inc.,* 10 P.3d 1256, 1262-63 (Colo. 2000)*; see also generally* Christopher Scott D'Angelo, *The Economic Loss Doctrine: Saving Contract Warranty Law from Drowning in a Sea of Torts*, 26 U. TOL. L. REV. 591, 592 (1995); Gennady A. Gorel, Note, *The Economic Loss Doctrine: Arguing for the Intermediate Rule and Taming the Tort-eating Monster*, 37 RUTGERS L.J. 517, 524 (2006). Viewed at a distance, the rule is eminently sensible: No gain can be had from injecting tort liability into contractual relations between sophisticated parties. *See, e.g., Grynberg v. Questar Pipeline Co.,* 70 P.3d 1, 11 (Utah 2003) (recognizing that the economic loss rule's underlying reasoning is that "tort law should govern the duties and liabilities imposed by legislatures and courts upon non-consenting members of society, and contract law should govern the bargained-for duties and liabilities of persons who exercise freedom of contract."). To do so would inhibit the parties' ability to arrange their affairs in an efficient, predictable, and mutually beneficial way. *See, e.g., Rich Prods. Corp. v. Kemutec, Inc.*, 66 F.Supp.2d 937, 968 (E.D. Wis. 1999) ("Society allows the parties to set the terms of their bargain and only intervenes to enforce or give meaning to those terms once a dispute develops."); s*ee also generally* 26 U. TOL. L. REV. at 594-97*;* Daniel M. Alsup, Note, *New Mexico's Economic Loss Rule, Unconscionability*

6

*Doctrine, and the Gap between Them: Concepts, Realities, and How to Mend the Gap*, 38 N.M.

L. Rev. 483, 484-86 (2008).

However things become much more complicated when courts are called upon to actually

apply the economic loss rule.  *See, e.g., Sandarac Ass'n v. W.R. Frizzell Architects, Inc.,* 609 So.

2d 1349, 1352 (Fla. Dist. Ct. App. 1992) ("The economic loss rule is stated with ease but applied

with great difficulty . . . .  Lawyers and judges alike have found it difficult to determine when the

rule applies and when an exception is appropriate.")*; see also generally* R. Joseph Barton, Note,

*Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent*

*Misrepresentation Claims*, 41 Wm. & Mary L. Rev. 1789 (2000).  Much of the trouble results

from courts' unease in applying the rule to parties who lacked either the leverage or

sophistication to bargain for a beneficial allocation of risk.  *See, e.g., Pilatus,* 358 F.Supp.2d at

1027.

New Mexico's somewhat unique formulation of the rule mitigates these problems by

recognizing the significance of bargaining-power parity.  It is against this backdrop that

Defendants' motion is considered.  Though New Mexico courts have failed to explicitly adopt a

framework for evaluating bargaining-power parity[4], one can be predicted from the pertinent jurisprudence.

New Mexico's unique version of the economic loss rule was adopted in *Utah International, Inc. v. Caterpillar Tractor, Co.,* 775 P.2d at 744.  After recognizing the importance of this factor, the court in *Utah International* found that the parties had sufficient parity in bargaining power.  *Id.* at 742. The *Utah International* parties' relationship proves to be typical of those to which New Mexico's economic loss rule has thus far been applied in reported decisions.  The plaintiff, Utah International, was a publicly traded, international mining and, for most of its history, construction company.  *See, e.g.*, Jason Matthew Smith, *The Great Builders: Utah Construction was how the West was won,* SALT LAKE MAGAZINE, August 2009[5]; *see also generally* GENE A. SESSIONS & STERLING D. SESSIONS, UTAH INTERNATIONAL: A BIOGRAPHY OF BUSINESS (2002).  Its storied past had included construction of a large stretch of the Western Pacific Railroad, construction of the Alaska Highway, and a significant role in the construction of the Hoover Dam.  *Id.*  After World War II, Utah International expanded into mining and developed massive mines in Peru, Australia, and the western United States.  *Id.*  By 1976, the

---

[4]  *See generally Wheeler Peak, LLC v. L.C.I.2.*, *Inc.* 2008 WL 6045576, *8 (D.N.M. 2008) ("While the Supreme Court of New Mexico has endorsed the economic-loss rule, the contours of the rule are uncertain . . . .") (internal citation omitted).  New Mexico courts have considered the parity of bargaining power most directly in the context of adhesionary contracts. *See, e.g., Berlangieri v. Running Elk Corp.,* 76 P.3d 1098, 1113 (N.M. 2003) (discussing bargaining power in context of adhesionary contracts).  Given the vast dissimilarity between the purposes of the adhesionary contract doctrine and the economic loss rule, the Court declines to apply the same standards to both.  Rather, as discussed *supra*, the Court is persuaded that a review of the economic-loss-rule jurisprudence provides a more accurate view of New Mexico's requirements for bargaining-power equality in this context.

[5]  *Available at:* http://www.saltlakemagazine.com/Salt-Lake-Magazine/August-2009/The-Great-Builders/

company had jettisoned most of its construction business and was the top mining firm in the United States.  *Id.*

It is thus unsurprising that *Utah International* involved the purchase of a coal hauler from its manufacturer, Caterpillar Tractor Co.  Caterpillar was, of course, itself a large, international company and its primary business was the manufacture of heavy equipment.[6]  Utah International was a company whose extensive mining operations required such equipment.

That New Mexico adopted its economic loss rule in the context of these two large, sophisticated companies[7] operating in an area of mutual expertise—where the content of their relationship could significantly affect each party's bottom line—is instructive.  Perhaps even more revealing is that, in doing so, New Mexico took the extra step of requiring bargaining-power parity before the rule could be applied.  New Mexico's more recent jurisprudence emphasizes this extra step.

After the rule was endorsed by the New Mexico Supreme Court in a case in which the plaintiff did not raise the issue of bargaining power, *Shollenbarger*, 893 P.2d at 446, the New Mexico Court of Appeals again considered its application.  In *Spectron Development Laboratory v. American Hollow Boring Co.*, the court applied the economic loss rule in limiting the plaintiff-manufacturer's ("Spectron") claims against a component-parts manufacturer ("AHBC").

---

[6] *See The History of Caterpillar, available at:* http://www.cat.com/corporate-overview/history.

[7] At the pertinent time, Utah International was a wholly-owned subsidiary of General Electric, while Caterpillar was on the precipice of becoming part of the Dow Jones Industrial Average.  *See, e.g., The Dow Jones Industrial Average Historical Components, available at:* www.djindexes.com/mdsidx/downloads/DJIA_Hist_Comp.pdf.

936 P.2d 852, 858-60 (N.M App. 1997).  The suit arose from the inclusion of a defective

component part, made by AHBC, in one of Spectron's light-gas guns.  *Id.* at 854-56.  In finding

that the economic loss rule applied, the court relied heavily on the fact that Spectron was "not the

ordinary consumer" of the component part but was, instead, the "only company in the United

States designing, fabricating and producing light guns."  *Id.* at 858.  As such, the court reasoned,

Spectron had comparable bargaining power and expertise to AHBC:

> The key feature here is that [the plaintiff] was essentially the manufacturer of the
> light-gas gun, acting as the designer and general contractor who subcontracted out
> the production and assembly of the component parts. This is not a situation in which
> the purchaser of the goods was substantially less knowledgeable than the supplier
> regarding the risks involved in the use of the goods. Indeed, the record indicates that
> [the plaintiff] had more expertise than any other entity in this country regarding
> light-gas guns. Neither did the purchaser suffer from having substantially less
> bargaining power than its supplier.  *Id.*

Taken as a whole, this jurisprudential thread defines the contours of New Mexico's parity

requirement:  In order for the economic loss rule to apply, the parties must—like the parties in

*Utah International* and *Spectron*—possess sufficient bargaining power to have been reasonably

expected to exact meaningful concessions from one another.  In determining whether sufficient

bargaining power was present, courts must consider a variety of factors including 1) whether any

real opportunities for bargaining existed, 2) whether both parties had an incentive to reach an

agreement, and 3) whether the parties' sophistication level, both generally and with regard to the

specific product, was comparable.  *See generally Spectron*, 936 P.2d at 858-59 (discussing

similar inquiry).  Notably, this Court is not at all concerned with the apparent wisdom of the

bargain struck—including whether each party actually exacted meaningful concessions.  Rather,

its sole focus is whether, under the facts presented, each party possessed enough bargaining power that they could have been reasonably expected to do so.

In this case, it is clear that no parity in bargaining power existed. First, and perhaps most importantly, C&C lacked any meaningful opportunity to bargain with Defendants regarding the allocation of liability. *See* UMF ¶¶ 2-4. C&C's purchase of the craft was at least six degrees removed from Defendants and there is no indication that the parties had any pre-sale contact whatsoever. *See generally Saratoga Fishing Co. v. J.M. Martinac & Co.,* 520 U.S. 875, 882 (1997) (noting the tension in applying the economic loss rule to some subsequent users "because, as other courts have suggested, the Subsequent User does not contract directly with the manufacturer or distributor . . . .").[8] Because the Court cannot conceive of any plausible way in which C&C could have exacted meaningful concessions from Defendants, it finds that the economic loss rule does not apply.[9]

_____

[8] It should be noted that C&C may have also lacked the sophistication necessary to exact meaningful concessions from Defendants, as it appears that C&C had little airplane-related expertise. But, because the record is underdeveloped with regard to this factor, the Court does not consider it.

[9] Defendants contend that, because C&C was "within the class of intended third-party beneficiaries of the warranty" and because the warranty "was negotiated on its behalf by the original purchaser," C&C's claims should be limited by the economic loss rule. This Court is unaware of any such wrinkle in New Mexico's economic-loss-rule jurisprudence. Were one to exist, it would functionally obliterate both the commercial-party and bargaining-power-parity requirements. In effect, there would be no principled basis for distinguishing between subsequent purchasers that are sophisticated commercial entities and subsequent purchasers that are not— regardless of their size, sophistication, or constitution, neither would ever have the opportunity to negotiate the allocation of risk. Deals would, as here, be struck further up the chain and purchasers of all stripes would be left with little or no recourse. This Court finds no legal or rational basis for such a stringent reading of New Mexico's economic loss rule.

This finding is borne out by the factually similar *U.S. Aviation Underwriters Inc. v. Pilatus Business Aircraft, Ltd.* 358 F.Supp.2d at 1021.  In *Pilatus*, a federal court declined to apply a version of the economic loss rule—that, unlike New Mexico's, did not explicitly require comparable bargaining power—because, *inter alia*, the aircraft-buyer plaintiff had no real opportunity to negotiate with the aircraft-engine-manufacturer defendant.  *Id*. at 1026-27. Recognizing that such situations undermine the purpose of the economic loss rule, the court stated that, "[The plaintiff] did not bargain with any of the aircraft or engine manufacturers, did not negotiate price concessions in exchange for limitations on liability and did not accept or allocate any risks.  It succeeded, if at all, to very limited warranties for the repair or replacement of airplane parts." *Id*.  Because, the Court explained, the economic loss rule is predicated on "equality of bargaining power and meaningful allocation of risk", it could not be used to bar plaintiff's claims.  *Id*. at 1026.

By the same token, this Court holds that—because there is the absence of any evidence supporting parity in the parties' bargaining power—New Mexico's economic loss rule does not preclude C&C's negligence and strict liability claims (Counts I-III).

### Implied Warranties and the Statute of Limitations

In addition to the aforementioned claims, C&C seeks damages arising from breach of the implied warranties of merchantability and fitness for a particular purpose.  Defendants respond that damages cannot be awarded because C&C's warranty claims 1) are time-barred and 2) have been expressly disclaimed.

The implied warranties under which C&C seeks redress are set forth in N.M. STAT. ANN. §§ 55-2-314 (merchantability)[10] and 55-2-315[11] (fitness for a particular purpose).  Actions based on these sections are limited by N.M. STAT. ANN. § 55-2-725.  Under § 55-2-725[12], actions for

---

[10]  N.M. STAT. ANN. § 55-2-314 states, in pertinent part:

(1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as:

> (a) pass without objection in the trade under the contract description; and

> (b) in the case of fungible goods, are of fair average quality within the description; and

> (c) are fit for the ordinary purposes for which such goods are used; and

> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

> (e) are adequately contained, packaged and labeled as the agreement may require; and

> (f) conform to the promises or affirmations of fact made on the container or label if any.

[11]  N.M. STAT. ANN. § 55-2-314 states:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

[12]  N.M. STAT. ANN. § 55-2-725 states, in pertinent part:

(1) An action for breach of any contract for sale must be commenced within four

breach of warranty must be brought within four years of delivery, unless the warranty explicitly guarantees future performance.  N.M. STAT. ANN. § 55-2-725.  Implied warranties, like those at issue here, do not explicitly guarantee future performance.  *See, e.g., May v. AC & S, Inc.*, 812 F.Supp. 934, 944 (E.D.Mo. 1993) ("An implied warranty is not based upon a clear expression by the manufacturer/seller that unambiguously warrants the future performance of the goods."); *see also* N.M. STAT. ANN. §§ 55-2-314 and 55-2-315.

Consequently, C&C's action is time-barred because it was not filed within four years of delivery.  Though there could be some dispute as to which delivery is operative—delivery of the turbocharger to Avco, delivery of the engine to Piper, delivery of the aircraft to Piper's distributor, delivery of the same to SSI, Epps, or Signature, or ultimate delivery to C&C—the point is largely moot.  Even taking the latest possible delivery date, the February 2003 date of delivery to C&C, C&C's implied warranty claim is still time-barred because this suit was not

---

years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered.

commenced until April 2009—over six years later.[13]  *See, e.g., Richards v. Midland Brick Sales Co., Inc.*, 551 N.W.2d 649 (Iowa App. 1996) (applying similar analysis to analogous facts).

Accordingly, C&C's warranties claim (Count IV) is dismissed with prejudice.

### *Implied Warranties and Disclaimer*

Because the statute of limitations disposes of Count IV of C&C's Complaint, the Court does not reach the issue of disclaimer.

## Conclusion

For the foregoing reasons, Defendants' motion is granted in part and denied in part.  The motion is granted with regard to Count IV of Plaintiffs' complaint–which is dismissed with prejudice—but is denied with regard to the economic loss rule.  Accordingly, Plaintiffs may proceed with their claims under Counts I-III.

## ORDER

It is hereby ORDERED that the motions for summary judgment filed by Defendant Avco Corporation (Doc. 33) and Defendant Kelly Aerospace (Doc. 36) are granted in part and denied in part.  Defendants' motions are GRANTED with regard to Count IV, which is hereby dismissed

---

[13]  C&C contends that it should not be bound by the limitations period set forth in § 55-2-725 because of "policy reasons" and because "the alleged defects were latent in nature."  C&C, as the master of its Complaint, has chosen to allege breach of warranties created by New Mexico statutes.  *See* §§ 55-2-314 and 55-2-315.  As such, C&C is bound by the statutory limitation on the period of time in which claims alleging such breaches may be brought.  *See* § 55-2-725. Under § 55-2-725's clear, unambiguous language, its limitation is not optional, cannot be ignored for "policy reasons," and is not altered by latent defects.  *Id.*  Because the limitations period expired before C&C filed its Complaint, Count IV is time-barred.

with prejudice.  Defendants' motions are DENIED with regard to the economic loss rule and

Plaintiffs may proceed with their claims on Counts I-III.


Dated: April 1, 2010

_____
BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE